BEFORE THE SECOND DIVISION, SEPTEMBER 16, 1965

No. 69541.—John H. Faunce Phila., Inc. *v*. United States, protest 62/9759 (Philadelphia).

RAO, Chief Judge: Imported through the port of Philadelphia was a shipment, described on the commercial invoice accompanying the entry papers as "100 only Agricultural Weed Burners," which the collector classified for customs duty purposes as articles or wares, not specially provided for, composed wholly or in chief value of steel, in paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, at 19 per centum ad valorem.

A timely protest has been filed pursuant to section 514 of the Tariff Act of 1930, against said classification and duty assessment. Plaintiff claims, in the alternative, that said articles should properly have been classified as agricultural implements, not specially provided for, in paragraph 1604 of said act and granted the benefit of free entry or should have been classified as machines, not specially provided for, in paragraph 372 of said tariff act, as modified by the sixth protocol, *supra*, and subjected to duty at the rate of 11½ per centum ad valorem.

For ready reference, the language of the claimed provisions of the tariff act is set forth below.

Paragraph 1604 of the Tariff Act of 1930:

Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins * * * and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repairs parts: * * *. [Free entry.]

Paragraph 372 of said act, as modified by the sixth protocol, *supra:*

Machines, finished or unfinished, not specially provided for:
    Adding machines

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|
| Other * * * _____ 11½% ad val. | | | | | | |

The only witness who was called to testify was Edward C. Geiger who identified himself as the owner of the E. C. Geiger Co., the actual importer of the articles at bar, plaintiff herein being his company's customhouse broker. Geiger testified that he is an importer and distributor of agricultural implements and that he has been engaged in this work for some 28 years. In 1959, a sample of the device in controversy was submitted to him by its manufacturer in England and, after he experimented with it for 6 months, he decided to import and distribute such merchandise through the United States, which he has done since that time.

A sample identical with the merchandise in issue, weighing approximately 3 pounds, was received in evidence as plaintiff's exhibit 1. As plaintiff's illustrative exhibit 2, there was received in evidence a catalog which the Geiger company uses for sales purposes and which briefly describes exhibit 1.

The witness testified to his familiarity with the nature and uses of the instant weed burners by virtue of his experimentation with them and through his experience of importing, distributing, selling, and servicing a great number of said devices. When queried as to the use of the weed burners according to his observation and experience, Geiger stated—

It is used in farming; it is used in related places to farming such as nurseries and greenhouses; it is used by industry; by public service commissions; highway departments: railroads and also by the homeowner. [The homeowner referred to was of the suburbanite type.]

As to the manner of its use, the witness testified—

They use this item by charging it with kerosene, igniting it, and with an intense flame coming out the bottom by holding it in their hand thusly burning objectionable weeds and in the wintertime, they melt ice from walks on steps and thaw frozen pipes.

Geiger testified that he has used the instant weed burners and demonstrated them, and that he has seen others use them "to burn weeds along fence rows on farms, along hedge rows, along driveways, paths. I have seen them used to melt ice in the watering trough where the animals are watered and primarily to burn weeds in various farm and land areas." He has also seen them used to sterilize soil in containers where seedlings are to be started.

When called upon to explain briefly how the weed burners operate, the witness testified as follows. The weed burners use kerosene as fuel. The pump at the top of the machine is unscrewed and approximately 1¾ pints of kerosene are put in the container tube filling it to within 3 inches of the top, the remaining area being left as a reservoir for air pressure. The burner in its entirety is then set in a cup of gasoline or alcohol and that amount of fuel is then ignited and it preheats the vaporizing coil which is inside the metallic-covered tube at the service end of the apparatus. After heating for approximately 2 minutes'

time, pressure is built up in the upper chamber by working the pump. The piston is raised with the hand and air enters the air chamber, creating pressure. After sufficient pressure is created, usually about 30 pounds per square inch, which is ascertained by the number of strokes applied to the pump, the valve is opened and the kerosene which is under pressure from the upper chamber goes into the vaporizing coil and expands as a gas. It goes down to the bottom of the coil and as it continues to expand goes up to a return tube and down into a jet. This jet has a predetermined orifice to measure the amount of vapor to come out The vapor is then ignited and combustion takes place through the exhaust area of the flame gun and the air is mixed with the vapor through the slots that appear on the metallic portion of the apparatus. An intense blue flame is created of from 12 to 18 inches in length and of a diameter a little larger than the diameter of the tube.

As plaintiff's illustrative exhibit 3, there was received in evidence an extra pump to demonstrate the mechanical features thereof. Witness Geiger stated that there is a spring located between the piston and the top of the handle, which spring is used to absorb the energy which is created by pulling the piston upward. It automatically absorbs the energy like a shock absorber. When the piston energy is applied to it and it is forced down, the air pressure created by the energy of pushing the piston down energizes the spring which appears at the "exit end" of exhibit 3. Geiger's testimony continued as follows—

At the exit end. When the spring is energized, it is compressed and allows a valve to go down and when the valve goes down, the air comes out a hole at the bottom into the pressure chamber of Exhibit 1. As the upward stroke of the piston starts the energy which we used and which this spring absorbed, then it opposes the force which it had before the energy, pushes this valve back closing the orifice so that our air cannot escape from this chamber in our upward stroke.

\* \* \* \* \* \* \*

Q. And, what is the purpose of creating that pressure?—A. The purpose of creating that pressure is to force the kerosene through the metering device so that it may expand when it goes into the vaporizing chamber.

Illustrative exhibit 3 was described as containing two springs both of which are used for practical purposes on the pump and both of which store energy. Geiger stated that exhibit 1 can operate without the upper spring which is a shock absorber but could not operate without the lower spring which is a compression spring.

Geiger stated that he had sold weed burners such as exhibit 1 "All over the United States" and added that he is the sole distributor for this country. He had sold some of the items on the west coast but the majority of his sales were in the eastern part of the United States. As to the use of the weed burners in the western part of the United States, the witness was either vague as to its use on farms, homes, industry, railroads, and highways, or did not know of such use. Based on an analysis of their advertising, Geiger gave the following comparison of the various uses of weed burners as among homeowners, industrial users, and farmers. He stated that 40 or 50 percent of the weed burners were sold to agricultural, horticultural, and nursery users, about 25 percent to highway commissions, railroads, and industry, and approximately 20 percent to homeowners.

Although the witness did not have exact figures, he estimated that, in 1960, his company imported approximately two or three hundred weed burners. Some were sold to distributors, some to dealers, and some to consumers. Of said two hundred or more weed burners imported in that year, Geiger stated that they were sold all over the United States, but he could not state percentage-wise

the number sold to different localities and, except for the analysis of his company's advertising previously referred to, he did not know the use to which they were applied geographically.

For plaintiff to succeed in its claim for free entry of the instant weed burners in paragraph 1604 of the Tariff Act of 1930, it must be shown not only that said articles are agricultural implements, namely, implements devoted to the production of food or raiment for man (*United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T.D. 35472), but also that they are chiefly used for agricultural purposes (*United States* v. *Spreckels Creameries, Inc.*, 17 CCPA 400, T.D. 43835).

In view of the nature of the evidence presented in this case, we do not feel called upon to consider in depth the scope of the principle of chief use as applied to the tariff provision initially relied upon in the instant case. On its face, it is apparent that the testimony offered by plaintiff is inadequate to support a holding that the imported articles were chiefly used for agricultural purposes. The evidence of use is evidently predicated for the most part on an analysis of advertising by the actual importer in three or four national publications. On such a basis, the statement is made that 40 or 50 percent of the weed burners were sold to agricultural, horticultural, and nursery users; about 25 percent to highway commissions, railroads, and industry; and approximately 20 percent to homeowners. Of the 40 or 50 percent sold to agricultural, horticultural, and nursery users, no evidence has been presented as to what proportion was actually used for agricultural purposes. Indefiniteness also accompanies the testimony wherein reference is made to the use of the devices in controversy for melting ice from walks or steps, and for thawing frozen pipes, as well as for sterilizing soil where seedlings are to be started, and for burning weeds, without any reference to the proportion of said uses or the category of the users.

For the foregoing reasons, we are of the opinion that the record presented is inadequate to establish chief use of the imported weed burners as agricultural implements. Accordingly, plaintiff's primary claim for classification as such within the purview of paragraph 1604 of the Tariff Act of 1930 must be overruled.

Consideration will now be given to the second of the alternative claims, namely, that the imported devices should properly have been classified as machines, not specially provided for, in paragraph 372 of said tariff act, as modified by the sixth protocol, *supra*, for which duty at the rate of 11½ per centum ad valorem is provided.

In support of its claim, plaintiff, in its brief, makes reference to the following cases wherein a variety of devices were held to be machines. *The Durst Mfg. Co., Inc.* v. *United States*, 50 CCPA 56, C.A.D. 820 (rotary lawn sprinkler tops). *Nord Light, Inc.* v. *United States*, 49 CCPA 12, C.A.D. 786 (light fixture pulleys). *United States* v. *IDL Mfg. & Sales Corp.*, 48 CCPA 17, C.A.D. 756 (hand-operated paper punches). *United States* v. *L. Oppleman, Inc.*, 25 CCPA 168, T.D. 49271 (aneroid barometers). *United States* v. *Endlein & Schmidt, United Hardware & Tool Corp.*, 22 CCPA 108, T.D. 47082 (hand counters or tallying registers). *United States* v. *Guth Stern & Co., Inc.*, 21 CCPA 246, T.D. 46777 (razor blade sharpeners). *United States* v. *Laing Harrar & Chamberlin*, 21 CCPA 235, T.D. 46763 (shoe-stretching devices). *United States* v. *Janson Co.*, 16 Ct. Cust. Appls. 315, T.D. 43075 (radio receiving sets). *United States* v. *Van Bourgondien Bros.*, 16 Ct. Cust. Appls. 420, T.D. 43135 (sterilizing apparatus). Several lower court decisions were also cited and have been considered by us.

In the *IDL Mfg.* case, *supra*, our appellate court, after referring to a number of cases involving the tariff provision for "machines," took the occasion to say—

The state of the case law leads us to but one conclusion. While many items have been held to be, or not to be, "machines," there is no "judicial determina-

tion" of what a machine is. It remains simply a question of common meaning and each case must be decided on the basis of its own facts, technical and legislative.

Reference was made to the above-cited conclusion in the subsequent case of *Nord Light, supra*, where the court stated—

The issue here, as it was in the *IDL* case, must be resolved on the basis of the common meaning of the word "machines" when applied to the technical facts of the present case.

It then proceeded to define the term "machine" as follows—

A common meaning of the word "machine," found in the dictionaries which we referred to in the *IDL* case, *supra*, is a device which may be either simple or complex, whose function is to increase the intensity of an applied force, or to change its direction, or to change one form of motion or energy into another form. Cf. The Columbia Encyclopedia, 2d Ed.

And, in the *Durst Mfg.* case, *supra*, our appellate court reaffirmed its position as previously set forth.

We now look to the record in the instant case to determine whether, on the basis of its own facts, the weed burners in issue are within the common meaning of the word "machine."

The only possible mechanical features of the devices at bar are two springs, one of which, plaintiff's witness testified, is located between the piston and the top of the handle. It serves as a "shock absorber" and, according to the testimonial record, is not essential to the operation of a weed burner inasmuch as such a device can operate without it. The second spring, located at the lower end of the pump mechanism, is referred to as a compression spring and, according to the testimony, is essential to the functioning of a weed burner.

Whereas, as was stated in the *Nord Light* case, *supra*, a machine may consist of "a device which may be either simple or complex," the functioning of the instant weed burner does not bring it within the mechanical principles requisite to constitute an article a machine.

We are reminded of the somewhat analogous case of *United Merchandising Corp. and Frank P. Dow Co., Inc.* v. *United States*, 42 Cust. Ct. 396, Abstract 63100, wherein air pumps used for inflating air mattresses, liferafts, and all types of inflatable objects were held not to be machines.

Relying, however, on the fact that "each case must be decided on the basis of its own facts, technical and legislative," after due consideration of the testimony of plaintiff's witness and of the exhibits both physical and illustrative, as well as the numerous authorities referred to by the parties hereto, we are of the opinion that the instant weed burners do not possess mechanical characteristics which would sustain their classification as machines within the provision of paragraph 372 of the Tariff Act of 1930, as modified, *supra*, as alternatively claimed by plaintiff. All the imported articles appear to do is to store up and release air pressure by the raising and lowering of the piston. Moreover, the pump portion of the imported articles appears to be no more than a starter which ceases to function when the weed burning aspects of the articles are brought into operation.

For the foregoing reasons, all claims in the protest are overruled.

Judgment will be entered accordingly.